

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

KARAYEL GEMI INSAA VE DENIZ NAKLIYAT
SANAYII TICARET LTD STI,

                  Plaintiff,

   - against -

METAL STAR TRADING CO. SAL,

                  Defendant.
-------------------------------------------------------------X

ECF CASE

## VERIFIED COMPLAINT

Plaintiff, KARAYEL GEMI INSAA VE DENIZ NAKLIYAT SANAYII TICARET LTD

STI (hereinafter referred to as "Plaintiff"), by and through its attorneys, Lennon, Murphy &

Lennon, LLC, as and for its Verified Complaint against the Defendant, METAL STAR

TRADING CO. SAL (hereinafter referred to as "Defendant") alleges, upon information and

belief, as follows:

    1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the

breach of maritime contract of charter. This matter also arises under the Court's federal question

jurisdiction within the meaning of 28 United States § 1331 and the New York Convention on the

Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*) and/or the

Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

    2.     At all times material to this action, Plaintiff was, and still is, a foreign corporation,

or other business entity, organized under, and existing by virtue of foreign law and was at all

material times the owner of the motor vessel "AKCAABAT" (hereinafter the "Vessel").

3.    Upon information and belief, Defendant was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law, and was at all material times the Charterer of the Vessel.

4.    By a charter party dated February 21, 2007, Plaintiff chartered the Vessel to Defendant for the carriage of "UP TO FCC IRON SCRAP NON OILY/NON DANGEROUS NON IMO/NON MOTOR BLOCK NON RADIOACTIVE/NO BORINGS/TURNINGS."

5.    Plaintiff delivered the Vessel into the service of the Defendant and fully performed all duties and obligations under the charter party.

6.    A dispute arose between the parties regarding Defendant's cancellation of the charter party and costs due and owing to Plaintiff under the charter party contract.

7.    As a result of breach of the charter party, Plaintiff sustained damages in the total principal amount of $111,275.48 exclusive of interest, arbitration costs and attorneys fees.

8.    Pursuant to the charter party, disputes between the parties are to be submitted to

9.    Plaintiff commenced arbitration of its claim against Defendant and on April 11, 2008, an award was rendered in Plaintiff's favor, including costs of the award. *A copy of the Final Arbitration Award is annexed hereto as Exhibit 1.*

10.    The arbitrator awarded Plaintiff the amount of $111,275.48 together with interest at the rate of 7.5% per annum, compounded with three month rests, from May 1, 2007 to the date of payment.

11.    Furthermore, the arbitrator also directed Defendant to pay Plaintiff's costs of the Final Award in the amount of £3,592.00 together with interest at the rate of 7.5% per annum, compounded with three month rests, from April 11, 2008 to the date of reimbursement.

12.    Defendant has failed to pay the amounts due and owing under the Final Arbitration Award.

13.    This action is brought in order to obtain jurisdiction over Defendants and also to obtain security for Plaintiff's claims and in aid of arbitration proceedings.

14.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party. Plaintiff expects to recover the following amounts pursuant to the Final Arbitration Award:

| | | |
|---|---|---|
| A. | Awarded amount: | $111,275.48 |
| B. | Interest on the Award - May 1, 2007-June 1, 2010 at 7.5% compounded quarterly: | $28,696.19 |
| C. | Costs of Final Award (£3,592.00): | $ 7,083.92 |
| D. | Interest on Costs of Final Award-April 11, 2008-June 1, 2010 at 7.5% compounded quarterly: | $ 1,220.77 |
| E. | Estimated attorneys' fees and expenses: | $ 20,000.00 |
| **Total:** | | **$168,276.36** |

15.    The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendant. *See Affidavit in Support of Prayer for Maritime Attachment annexed hereto as Exhibit 2.*

16.    The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the Defendant held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendant and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

B.    That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$168,276.36** belonging to, due or being transferred to, from, or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.    That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

D.    That this Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending, or which has or may be

initiated in the future, including any appeals thereof;

E.    That this Court recognize and confirm any arbitration award(s) or judgment(s)

rendered on the claims set forth herein as a Judgment of this Court;

F.    That this Court award Plaintiff the attorneys' fees and costs incurred in this

action; and

G.    That the Plaintiff has such other, further and different relief as the Court

may deem just and proper.

Dated:      New York, NY
            June 11, 2008


                        The Plaintiff,
                        KARAYEL GEMI INSAA VE DENIZ
                        NAKLIYAT SANAYII TICARET LTD STI


            By: _____
                        Kevin J. Lennon
                        Coleen A. McEvoy
                        LENNON, MURPHY & LENNON, LLC
                        420 Lexington Avenue, Suite 300
                        New York, NY 10170
                        (212) 490-6050 - phone
                        (212) 490-6070 - facsimile
                        kjl@lenmur.com
                        cam@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York    )
                     )    ss.:    City of New York
County of New York   )

1.    My name is Coleen A. McEvoy.

2.    I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.    I am an attorney in the firm of Lennon, Murphy & Lennon, LLC attorneys for the Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.    The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.    The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    New York, NY
          June 11, 2008


                              Coleen A. McEvoy

# EXHIBIT 1

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN:-

KARAYEL GEMI INSAA VE DENIZ NAKLIYAT SANAYII TICARET LTD STI
of Turkey

Claimant
(Owners)

- and -

METAL STAR TRADING CO SAL of Lebanon

Respondent
(Charterers)

mv "AKCAABAT"

Charterparty dated 21st February 2007

FINAL ARBITRATION AWARD

WHEREAS:

1.   By a voyage charter in substantially the terms of the Gencon box layout form
     concluded and evidenced by a fixture note dated 21st February 2007 ("the
     charterparty"), the Claimant ("the Owners") chartered the mv. "AKCAABAT" to the
     Respondent (the Charterers") to carry a cargo of iron scrap in an amount up to the
     full and complete capacity of the vessel from Annaba, Algeria to Nemrut, Turkey on
     terms and conditions more particularly set out in the charterparty.

- 2 -

2.     The charterparty provided:-

        "*ARBITRATION – IN LONDON AS PER ENGLISH LAWS*"

3.     A dispute arose as detailed hereafter for the determination of which the Owners, through their Turkish claims consultants, Nexlaw, on 22nd May 2007 appointed me the undersigned Christopher J W Moss of 4 Charlotte Place, Wilton Road, London SW1V 1DP to act as arbitrator, notifying the Charterers of my appointment and calling on them to appoint an arbitrator on their own behalf.

4.     No response was received from the Charterers.   Accordingly, on 8th June 2007 the Owners requested me to accept appointment as sole arbitrator by default pursuant to the terms of Section 17 of the English Arbitration Act 1996.

5.     I confirmed my acceptance of the appointment to act as sole arbitrator by default on 8th June, sending a copy of my fax message confirming acceptance to the Charterers at the fax number provided, as well as to the Charterers' broker, Brinkman Chartering Groningen BV, Netherlands and the Charterers' agent in Algeria, Aljo Shipping & Services Co SARL.

6.     Claim submissions and supporting documents were served on behalf of the Owners under cover of a letter of 10th October 2007.  On 26th November 2007 the Owners' claims consultants sent me a copy of a letter which they had sent to the Charterers and the two brokers and agents involved asking them to advise by 28th November 2007 when the Charterers' defence submissions would be served.

7.     No response was received from or on behalf of the Charterers.  Accordingly, on 30th November 2007 the Owners' claims consultants requested me to make an Order for service of defence submissions by 4th December.

-3-

8.    On 12th December 2007 I sent the following message to the parties:-

> "I must apologise to the parties for my failure as yet to deal with the
> application made by Nexlaw in their fax of 30th November.    As my
> secretary advised in her message of 3rd December, I have only just
> returned from a visit to Asia.
>
> Although Nexlaw have requested that an Order for service of Defence
> submissions be made in Final and Peremptory terms, since it appears
> that no Order for service of Defence submissions at all has as yet been
> made, it would be inappropriate to make a Final and Peremptory Order
> at this stage.
>
> However, I now Order that Defence submissions (and submissions in
> support of any Counterclaim) be served by no later than 19th December.
>
> The Respondents must understand that if this Order is not complied
> with, the Claimants will be at liberty to request me to make a Final and
> Peremptory Order with a short time limit. Should that situation arise, it
> is likely that such an Order would be made and that if it were not to be
> complied with, I would then be entitled to consider the dispute on the
> basis of the documents and submissions put before me by the Claimants
> and, if appropriate, proceed to an Award.
>
> I hope that it will not come to this and that the Respondents will see fit
> to participate in the arbitration by letting me have Defence submissions
> (accompanied by any relevant documents) setting out their position.
>
> If I can be of assistance with regard to any matters of procedure, the
> Respondents should not hesitate to contact me.   I now hope to hear

- 4 -

from the Respondents by 19th December in accordance with the terms of
my Order."

9.   I received no response from or on behalf of the Charterers to this message. Nor did
the Owners' claims consultants. They therefore requested me in a letter dated 8th
January 2008 to make a Final and Peremptory Order for service of defence
submissions. On 22nd January 2008 I sent the following message to the parties:-

"I refer to Nexlaw's fax of 8th January – to which there seems to have
been no response from the Charterers.

Since it seems to me that the Charterers have now been given every
reasonable opportunity to participate by serving Defence submissions in
the arbitration, I am satisfied that it is appropriate to make a Final and
Peremptory Order as requested by Nexlaw.

I therefore now Order that any submissions from the Charterers by way
of Defence to the Claim (or, in support of any Counterclaim) be served
(together with relevant supporting documents) by no later than 29th
January.

The Charterers must understand that this is a Final and Peremptory
Order. If it is not complied with I shall therefore conclude that the
Charterers have taken a conscious decision not to participate in the
arbitration. If we reach that point, I shall then consider the documents
and submissions put before me on behalf of the Claimants and, if
appropriate, proceed to an Award without further notification to the
parties."

Murphy & Lennon LLC                                    No. 5226    P. 21

-5-

10.    No response was received from or on behalf of the Charterers to this message. Accordingly, on 4th March 2008 the Owners' claims consultants requested me to proceed to an Award.

11.    This arbitration arose out of the cancellation of the charterparty. Although the cancellation of the charterparty was said to have resulted from frustration (in that the Algerian government was said to have stopped the export of scrap cargoes from Algerian ports shortly before the vessel was due to load) it was unnecessary for me to consider as a matter of English law whether the contract had indeed been frustrated. That was because the Charterers' agents and brokers, Aljo, had confirmed in terms that the Charterers were prepared to pay the Owners' losses resulting from the cancellation of the charterparty and to refund the disbursements which had already been remitted to the Algerian agents at that point. It will be necessary for me in due course to set out the terms in which this confirmation was provided since it was an important aspect of the Owners' claim in this arbitration. Before doing so I shall refer to the essential facts.

12.    A lumpsum freight of US$145,000.00 was agreed, freight to be payable within three banking days of issuing bills of lading.

13.    The vessel is a 2005 built general cargo vessel with two holds/hatches of 4,910 grt/2,883 nrt. She has a deadweight of 8,128 mt, a bale capacity of 8,513 cbm and a grain capacity of 8,776 cbm.

14.    The fixture having been concluded, she sailed for Annaba in ballast from Ancona on 21st February 2007, and arrived at Annaba on 25th February 2007 at 19.25 hours local time, dropping anchor on arrival.

15.    It was on 27th February 2007 at 11.05 hours that the Owners received a message from the Charterers cancelling the charterparty on the grounds that a decree of the

- 6 -

Algerian government had made it impossible for them to provide the contractual cargo. The message - which the Owners received through the broker channel - was as follows (I set out below, verbatim, the relevant parts of this and the other important messages from or on behalf of the Charterers):-

> "PLS NOTE THAT OUR CHRTR METAL STAR IS IN OBLIGATION TO CANCEL THE C/P OF MV AKCAABAT DUE TO THE LATEST DECISION OF THE ALGERIAN GOVERNMENT AND CUSTOMS. THIS DECISION IS AS FOLLOWING

> ALL EXPERT OPS (steel scrap) TO BE STOPED TILL THE NEW CHART WHICH IS UNDER STUDY TO BE READY FOR NEXT DAYS

> OWNERS CAN ASK AT ALL ALGEREAN PORTS AND THEY CAN CONFIRM INFOS".

16.  Shortly after this the Owners received a further message for Aljo which reads as follows:-

> "PLS BE ADVISED THAT CHARTR HAVE ALL FILS SHOWING THAT ALTERIAN GOVERNMENT STOPED THE EXPORT OPERATIONS OF STEEL SCRAP

> AND THIS MATER IS OUT OF CONTROL AND NO ANY CHANCE FOR CHARTR TO LOAD THE VESSEL

> CHARTR IS READY TO PAY OWNERS LOOSES FOR THE BALAST FRM ADRIATIC TO ANNABA AND THE D/A TO BE REFUNDED TO OWNER OR TO BE REMITTED TOGETHER WITH THE LOOSES WAITING FOR OWNERS COMMENT"

- 7 -

17.   Amongst the documents which were included for my consideration was a printout of an email dated 15th March from Aljo to the Owners which referred to a telephone conversation and stated:-

> "... we confirm that on next Monday when the Charters will be her and accept payment of all looses occured due to cancellation of scrap voyage we'll add together all outstanding the amount of the Proforma already remitted to us.
>
> Your bank details are dully noted.
>
> Thanks for your understanding and sorry for this delay."

18.   It appeared from this document that following the Charterers' offer to pay the wasted expenses of the ballast voyage from Ancona to Annaba (and to refund the sum remitted by the Owners to Aljo for disbursements at Annaba) there had been further discussions in which the Owners had made it clear that they expected to be reimbursed all their legally recoverable losses resulting from the cancellation of the charter. The doctrine of frustration is of very limited effect in English law and there was simply no evidence before me on the basis of which I could have taken a view as to whether the contract had indeed been frustrated, as the Charterers contended. The Owners were apparently prepared not to argue the point, given that they considered that the Charterers had agreed to pay them all their losses resulting from the cancellation in any event. The task facing me in this arbitration was therefore simply to consider the calculations put forward by the Owners, through their Turkish claims consultants, in support of their claim for damages.

19.   In doing so I considered that I had to review the calculations and supporting documents critically so as to be in a position to consider whether there were any

- 8 -

obvious objections to the Owners' claim which might have been taken by the Charterers had they seen fit to participate in the arbitration.

20. There was no doubt that the Charterers were fully aware of this arbitration. I received confirmation in terms at the close of submissions from Brinkman Chartering Groningen BV that they had passed all correspondence which I had sent to them on to "Charterers' brokers, Messrs Aljo Shipping and Services Co SARL, Algeria". Brinkman Chartering advised me that all their requests for a response from Charterers/Aljo had been "in vain". I was satisfied therefore that it was appropriate for me to consider the Owners' claim on the basis of the submissions and documents which they had put before me and without any contribution from the Charterers.

21. As a matter of basic principle the Owners were entitled to recover from the Charterers damages which would put them (as far as possible) in the position in which they would have been had the charterparty contract been performed. The damages initially claimed were, as noted above, US$139,248.35. However, at a later stage in the arbitration the Owners put before me a more detailed calculation showing the slightly increased sum of US$139,327.35.

22. As a matter of English law, where a charterer fails to provide a cargo and the charterparty is cancelled as a result, the owner is entitled to claim the loss of the anticipated profit under the charterparty, together with any expenses involved in performance up the date of cancellation. Where the charterer's breach has deprived the owner of the opportunity to earn the contractual freight, the measure of damages recoverable by the owner will essentially be the difference between the contractual and the market rate of freight. However, where charterparties are concerned, it will – more often than not – be the case that there is no available market in substitute charters involving carriage of the same or similar cargoes from the same loading port

- 9 -

to the same discharge port. In these circumstances to quote *Cooke et al on "Voyage Charters"*:-

> "... the damages are normally calculated by making a comparison between the gross profit (namely freight, demurrage and other charges, less voyage expenses) which the owner would have derived from the broken charterparty, and the gross profit which he has earned under the substitute charter or charters, the latter being apportioned so as reflect the amount earned up to the date when performance of the original charter would have been completed."

23.    I note the view expressed by the learned authors of *"Voyage Charters"* to the effect that damages in such circumstances will normally be assessed up to the date when performance of the cancelled charter would have been completed. In the present case the Owners calculated their losses, not up to the date on which the cancelled voyage from Annaba to Nemrut would have been completed, but by reference to the date on which the substitute voyage from Taranto to Bilbao and Pasajes would have been completed. Although they did not spell out their reasons for doing so, it seemed to me to be clear that they had adopted this approach because they took the view that they had mitigated their damages by entering into the substitute fixture from Taranto to Bilbao and Pasajes and should therefore be compensated for their losses throughout the period of the substitute fixture. That was presumably because they took the view that this approach provided the most accurate and reliable assessment of their losses flowing from the breach.

24.    Under English law the 'innocent victim' of a breach of contract is not under an obligation to do anything other than in the ordinary course of business and the standard applied in judging whether he has behaved reasonably when faced with the breach is not a high one, since the contract breaker is considered to be a wrong-doer. It is well-established as a matter of English law that provided a shipowner who faces this situation has acted reasonably in mitigating his loss, the actual

- 10 -

receipts under the substituted charterparty will be taken as the basis of the damages calculation.

25.    Before turning to the substitute voyage which the Owners performed following the cancellation of the charterparty, I note that there was no basis on which it seemed to me to be possible to argue that the Owners had acted unreasonably when faced with the breach. I was satisfied therefore that the Owners were entitled to use the profit on the calculations made for the substitute voyage as the basis of their claim for damages against the Charterers in this arbitration.

26.    Following the cancellation of the charterparty on 27th February, the Owners fixed the vessel on 2nd March for the carriage of a cargo of steel products from Taranto to Bilbao and Pasajes. The charterparty was also on a Gencon form and freight was agreed in the amount of €21.00 per metric ton for one loading and one discharge port.

27.    The vessel sailed from Annaba for Taranto on 2nd March 2007 at 17.20 hours and arrived at Taranto on 5th March at 05.33 hours. She loaded a cargo of 7,332.824 mt of steel coils for discharge at Bilbao and Pasajes and sailed from Taranto at 19.50 hours on 9th March 2007. The vessel's ETA Bilbao on leaving Taranto was 20th March. However, apparently as a result of bad weather on the voyage, she did not arrive at Bilbao until 27th March 2007 at 06.30 hours. She discharged 3,095.374 mt of the cargo of steel coils at Bilbao and left for Pasajes at 12.35 hours on 9th March. She arrived at Pasajes at 18.30 hours the same day and completed discharge of the balance of the cargo on 3rd April 2007 at 14.40 hours. Thus, instead of the estimated time of 17.295 days for the contractual voyage from Annaba to Nemrut, the substitute voyage took a period of 31.474 days.

28.    To calculate their damages in this arbitration the Owners arrived at what they maintained was the daily profit which they would have earned under the

- 11 -

contractual voyage from Annaba to Nemrut and compared this with the daily profit earned under the substitute fixture from Taranto to Bilbao and Pasajes.    This produced a daily difference of US$2,369.31.    They then applied this figure to the period of 31.474 days taken for the substitute voyage.

29.    The basis of the Owners' damages calculation can be summarised as follows:-

1. Cancelled voyage from Annaba to Nemrut as per C/P dated 20th February 2007:

| | | |
|---|---|---|
| Freight | | US$145,000.00 |
| Estimated D/A Nemrut | US$  5,486.00 | |
| D/A Annaba | US$  7,550.00 | |
| Bunker Expenses | US$ 31,869.50 | |
| Commission | US$  5,437.50 | |
| Total Expenses | US$ 50,343.00 | |
| Gross Profit | US$ 94,657.00 | |

Gross Profit ÷ estimated time for voyage (17.295 days) = daily profit of US$5,473.08

2. Alternative voyage from Taranto to Bilbao and Pasajes as per C/P dated 2nd March 2007:

| | | |
|---|---|---|
| Freight (€153,989.304 x 1.3158) | | US$202,619.12 |
| D/A Taranto (€11,288.18 x 1.3158) | US$ 14,852.98 | |
| D/A Bilbao (€9,657.48 x 1.3158) | US$ 12,707.31 | |
| D/A Pasajes (€14,399.37 x 1.3158) | US$ 18,946.69 | |
| Bunker Expenses | US$ 50,000.00 | |
| Commission | US$  7,598.21 | |
| Total Expenses | US$104,930.77 | |
| Gross Profit | US$ 97,688.35 | |

Gross Profit ÷ estimated time for voyage (31.474 days) = daily profit of US$3,103.77

I note here that the Owners' figure for the substitute voyage was said to be based on the "estimated" time of 31.474 days. According to my calculations the actual voyage (from 17.20 hours on 2nd March to 14.40 hours on 3rd April) was slightly longer

- 12 -

(31.888 days) but since this small difference was to the benefit of the Charterers, I accepted the Owners' figure as the correct one for present purposes.

30.    Having established that as a result of the Charterers' breach they had suffered a daily loss in earnings of US$2,369.31 during the course of the charter, the Owners calculated their loss of earnings as follows:-

$$31.474 \text{ days} \times US\$2,369.31 = US\$74,571.66$$

31.    In addition to their claim for loss of earnings over the period of the substitute charter, the Owners claimed damages representing their loss resulting from the wasted ballast voyage from Ancona to Annaba and the time used at Annaba – both the time spent waiting for cargo prior to the cancellation and the time lost until they were able to obtain the substitute fixture. For the purpose of calculating their damages for these two periods the Owners took not the daily loss of profits of US$2,369.31, but the figure of US$5,473.08 representing the daily profit which they would have made according to their calculations for the cancelled voyage. Their calculation in respect of these two elements of their claim can be summarised as follows:-

(i)    Time used for the voyage from Ancona to Annaba

$$4.125 \text{ days} \times 5,473.08 = US\$22,576.45$$

(ii)    Time used at Annaba waiting for cargo and waiting for a substitute fixture

$$4.913 \text{ days} \times US\$5,473.08 = US\$26,889.24$$

(iii)    Bunker expenses for the voyage Ancona – Annaba = US$15,290.00

- 13 -

The total claim in respect of these losses therefore amounted to US$139,327.35.

32.   Clearly no objection could be raised to the claim in respect of bunker expenses for the voyage Ancona – Annaba.  However, it seemed to me that the manner in which the Owners had calculated their claim in respect of the time taken for the voyage itself and time spent waiting at Annaba was inconsistent with the approach which they had adopted to the calculation of their loss of profit overall.

33.   As noted above, for the purpose of calculating the extent to which they were worse off as a result of having to perform the voyage Taranto – Bilbao – Pasajes than they would have been had they performed the contractual voyage Annaba – Nemrut, they had taken the difference between the anticipated and actual daily profit figures for these two voyages and then applied that to the whole period of 31.474 days taken for the voyage Taranto – Bilbao – Pasajes.  Notwithstanding the fact that such a calculation would normally extend only to the date when performance of the original charter would have been completed (see para 22 above), I accepted that in the circumstances of the present case the Owner's decision to fix the vessel for the voyage Taranto – Bilbao – Pasajes could not be criticised and that their loss therefore continued for the whole period of this voyage.  However, when assessing the daily loss in earnings for this period it seemed to me that the figure which was relevant was the difference between the projected daily profit under the contractual voyage (US$5,473.08) and that under the actual substitute voyage (US$2,369.31) and not simply the projected daily profit under the contractual voyage.

34.   Accordingly, I concluded that the correct basis for the calculation of the Owners' losses was as follows:-

Time used for the voyage from Ancona to Annaba:

4.125 days x US$2,369.31 = US$9,773.40

- 14 -

Time used at Annaba waiting for cargo and for substitute fixtures:

4.913 days x US$2,369.31 = US$11,640.42

Adding the total of these two elements (US$21,413.82) to the bunker expenses for the Ancona – Annaba voyage (US$15,290.00) I concluded that the Owners' recoverable loss for these two periods therefore amounted to US$36,793.82 rather than the figure of US$64,755.69 claimed in respect of these three elements of the claim.

35.    The Owners were therefore entitled to damages in the total amount of US$111,275.48 as opposed to the total of US$139,327.35 claimed. They also were entitled to interest on this sum at a commercial rate, compounded at three monthly rests, as is now customary in maritime arbitrations in London.    They were also entitled to their recoverable legal costs.

NOW I, the said Christopher J W Moss, having taken upon myself the burden of this arbitration and having carefully and conscientiously considered the evidence put before me and the submissions addressed to me, DO HEREBY MAKE, ISSUE AND PUBLISH this my FINAL AWARD as follows:-

A.    I FIND AND HOLD that the Owners' claim succeeds in the sum of US$111,275.48 and no more.

B.    I THEREFORE AWARD AND ADJUDGE that the Charterers shall forthwith pay to the Owners the sum of US$111,275.48 (one hundred and eleven thousand, two hundred and seventy-five United States dollars and forty-eight cents) together with interest on this sum at the rate of 7.5% per annum, compounded with three monthly rests from 1st May 2007 to the date of payment.

- 15 -

C.    I FURTHER AWARD AND ADJUDGE that the Charterers shall bear and pay the
Owners' recoverable legal costs of the arbitration (such costs to be assessed, if not
agreed, either by the High Court or by myself in an Award of Assessed Costs for
which purpose I expressly reserve jurisdiction) together with the costs of this my
FINAL AWARD in the sum of £3,592.00 (inclusive of my appointment fee and
interlocutory fees and disbursements), PROVIDED that if, in the first instance, the
Owners shall have paid any part of the costs of this my FINAL AWARD, they shall
be entitled to immediate reimbursement by the Charterers of the sum so paid,
together with interest at the rate of 7.5% per annum, compounded with three
monthly rests, from the date of payment to the date of reimbursement.

Given under my hand in London this 11th day of April 2008.

Sole Arbitrator

Witness

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
KARAYEL GEMI INSAA VE DENIZ NAKLIYAT :
SANAYII TICARET LTD STI,                       :
                                                :
                        Plaintiff,              :
                                                :
            - against -                         :            ECF CASE
                                                :
METAL STAR TRADING CO. SAL,                     :
                                                :
                        Defendant.              :
-------------------------------------------------------- X

## AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut   )
                       )      ss:  Town of Southport
County of Fairfield    )

Coleen A. McEvoy, being duly sworn, deposes and says:

1.      I am a member of the Bar of this Court and represent the Plaintiff herein.  I am
familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the
issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the
Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

## DEFENDANT IS NOT PRESENT IN THE DISTRICT

2,      I have attempted to locate the Defendants METAL STAR TRADING CO. SAL
within this District.  As part of my investigation to locate the Defendant within this District, I
checked the telephone company information directory, as well as the white and yellow pages for
New York listed on the Internet or World Wide Web, and did not find any listing for the
Defendant.  Finally, I checked the New York State Department of Corporations' online database
which showed no listings or registration for the Defendant.

3.    I submit based on the foregoing that the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

4.    Upon information and belief, the Defendant has, or will have during the pendency of this action, tangible and intangible property within this District and subject to the jurisdiction of this Court, held in the hands of in the hands of garnishees within this District, which are believed to be due and owing to the Defendant.

5.    This is Plaintiff's first request for this relief made to any Court.

**PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER**

6.    Plaintiff seeks an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy R. Peterson, Coleen A. McEvoy, Anne C. LeVasseur or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, in addition to the United States Marshal, to serve the Ex Parte Order and Process of Maritime Attachment and Garnishment, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff) may hold assets of, for or on account of, the Defendant.

7.    Plaintiff seeks to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiff and entered against the Defendant.

2

8.    To the extent that this application for an Order appointing a special process server with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple delivery of the Process of Maritime Attachment and Garnishment to the various garnishees to be identified in the writ.

## PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

9.    Plaintiff also respectfully requests that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendant, within this District. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

## PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

10.    Further, in order to avoid the need to repetitively serve the garnishees/banks, Plaintiff respectfully seeks further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service of process throughout any given day on which process is served and throughout the next day, provided that process is served the next day, and to authorize service of process via facsimile or e-mail following initial *in personam* service.

3

Dated: June 11, 2008
          Southport, CT

_____
          Coleen A. McEvoy

Sworn and subscribed to before me
this 11th day of June, 2008.

_____
Notary Public / Commissioner of
Superior Court

4